**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

**DENISE BAKER,**
*For herself and on behalf of all*
*similarly situated individuals*,

       **Plaintiff,**

**v.**                                                    **Case No.: 1:17-cv-1160 (LMB/JFA)**

**NAVIENT SOLUTIONS, LLC**

       **Defendant.**


**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION  1

II.  STATEMENT OF DISPUTED FACTS  2

III.  STATEMENT OF OMITTED UNDISPUTED FACTS  3

IV.  STANDARD OF REVIEW  7

V.  ARGUMENT  7

    A.  Two red-herring arguments offered by NSL should be rejected.  7

        1.  Plaintiff need not offer expert testimony to prevail on the ATDS issue  7

        2.  Use of a manual dialing mode is not determinative on the ATDS issue  8

    B.  Preliminary background discussion relevant to the ATDS issue  11

        1.  The statutory definition of ATDS and the 2003 and 2008 Orders.  11

        2.  The 2015 Declaratory Ruling  12

        3.  *ACA Int'l* did not vacate the 2003 or 2008 Orders.  14

    C.  NSL used an ATDS to make the Four Telephone Calls to Baker.  17

        1.  The Interaction Dialer telephone dialing system used to call Ms. Baker is a predictive dialer and, as such, an ATDS under the 2003 and 2008 Orders.  17

        2.  The Interaction Dialer telephone dialing system used to call Ms. Baker is an ATDS under the statutory definition.  20

        3.  The Interaction Dialer telephone dialing system used to call Ms. Baker is an ATDS under an alternative interpretation of the statutory definition.  23

    D.  The HCI and MCA cases on which NSL relies are distinguishable.  25

    E.  Plaintiff has produced sufficient evidence of NSL's willfulness.  27

    F.  The TCPA exemption for U.S. government collection calls.  28

    G.  The FCC's 2016 Broadnet Ruling  29

VI.  CONCLUSION  30

## TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*ACA Int'l v. FCC*,
   885 F.3d  687 (D.C. Cir. Mar. 16, 2018)               10, 14-17, 19, 27

*Arora Transworld Sys., Inc.*,
   2017 WL 3620742 (N.D. Ill. 2017)                    25-26

*Baisden v. Credit Adjustm'ts, Inc.*,
   813 F.3d 338 (6th Cir. 2016)                           11

*Barnhart v. Thomas*, 540 U.S. 20 (2003)                    21

*In re Bateman*, 515 F.3d 272 (4th Cir. 2008)           21

*Bates v. Dollar Loan Ctr., LLC*,
   2014 WL 3516260 (D. Nev. 2014)                      8, 11

*Blow v. Bijora, Inc.*,
   855 F.3d 793 (7th Cir. 2017)                           11

*Brown v. NRA Grp., LLC*,
   2015 WL 3562740 (M.D. Fla. 2015)                     7

*Cahlin v. Gen'l Motors Acceptance Corp.*,
   936 F.2d 1151 (11th Cir.1991)                        28

*Carroll v. Logan*, 735 F.3d 147 (4th Cir. 2013)         20

*Castro v. Green Tree Serv., LLC*,
   959 F. Supp. 2d 698 (S.D.N.Y. 2013)                 7

*Dalton v. Capital Assoc'd. Indus., Inc.*,
   257 F.3d 409 (4th. Cir. 2001)                         28

*Davis v. Diversified Consul'ts, Inc.*,
   36 F. Supp. 3d 217 (D. Mass. 2014)                  7

*In re Dynasty Mortg., LLC*,
   22 FCC Rcd 9453 (2007)                             28

*Echevvaria v. Diversified Consul'ts Inc.*,
   2014 WL 929275 (S.D.N.Y. 2014)                     7

*FCC v. ITT World Commc'n, Inc.*,
   466 U.S. 463 (1984)                                 11

*Gillard v. Receivables Perform. Mgmt., LLC*,
   2015 WL 3456751 (E.D. Pa. 2015)                     7

iii

*GTE South, Inc. v. Morrison*,
    199 F.3d 733 (4th Cir. 1999)                            11

*Hammer v. JP's Sw. Foods, LLC*,
    739 F. Supp. 2d 1155 (W.D. Mo. 2010)           28

*Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*,
    1998 U.S. Dist. LEXIS 23349, 1998 WL 1988826 (S.D. Ind. 1998),
    *aff'd*, 187 F.3d 743 (7th Cir. 1999)              3

*Jacobs v. N.C. Admin. Office of the Courts*,
    780 F.3d 562 (4th Cir. 2015)               7

*Jones v. Chapman*,
    2017 U.S. Dist. LEXIS 64781 (D. Md. 2017)       3

*Law Co. v. Mohawk Constr. & Supply Co.*,
    577 F.3d 1164 (10th Cir. 2009)             3

*Lee v .Town of Seaboard*,
    863 F.3d 3237 (4th Cir. 2017)              7

*Mais v. Gulf Coast Collect'n Bur., Inc.*,
    768 F.3d 1110 (11th Cir. 2014)             11

*Maljack Prods. v. Goodtimes Home Video Corp.*,
    81 F.3d 881 (9th Cir. 1996)               3

*Manuel v. NRA Grp., LLC*,
    200 F. Supp. 3d 495 (M.D. Pa. 2016) *aff'd* __ Fed. Appx. __,
    2018 WL 388622 (3rd Cir 2018)              7

*Marshall v. CBE Grp., Inc.*,
    2018 WL 1567852 (D. Nev. Mar. 30, 2018)      26, 27

*Nack v. Walburg*,
    715 F.3d 680 (8th Cir. 2013)               11

*Nelson v. Santander Cons. USA, Inc.*,
    931 F. Supp. 2d 919, *vacated by joint motion following settlement*
    2013 U.S. Dist. LEXIS 142699 (W.D. Wis 2013)     9

*Pozo v. Stellar Recovery Collection Agency, Inc.*,
    2016 WL 7851415 (M.D. Fla. 2016)         25, 26

*Reyes v. BCA Fin. Servs, Inc.*,
    2018 WL 2220417 (S.D. Fla. May 14, 2018)     15, 16

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)                            27

*Satterfield v. Simon & Schuster, Inc.*,
   569 F.3d 946, 952 (9th Cir. 2009)                                   9

*Smith v. Stellar Recovery, Inc.*,
   2017 WL 955128 (E.D. Mich. 2017)                                    25

*Snyder v. Whittaker Corp.*,
   839 F.2d 1085 (5th Cir. 1988)                                        3

*Strauss v. CBE Grp., Inc.*,
   173 F. Supp. 3d 1302 (S.D. Fla. 2016)                             26, 27

**FCC Orders and Declaratory Rulings**

*In re Rules & Regulations Implementing the Telephone Consumer Protection
Act of 1991*, 18 FCC Rcd. 14,014 (2003) ("2003 Order")                    12, 15-17

*In re Rules & Regulations Implementing the Telephone Consumer Protection
Act of 1991*, 23 FCC Rcd. 559 (2008) ("2008 Declaratory Ruling")          12, 15-17

*In re Rules & Regulations Implementing the Telephone Consumer Protection
Act of 1991*, 30 FCC Rcd. 7961 (2015) ("2015 Declaratory Ruling")         9, 10, 12-16,
                                                                          21, 22, 27

*In re Rules & Regulations Implementing the Telephone Consumer Protection
Act of 1991*, 31 FCC Rcd. 9074 (2016) ("2016 Order)                        29

In re *Rules & Regulations Implementing the Tel. Cons.. Prot. Act of 1991,
Petitions for Declaratory Ruling by Broadnet Teleservices LLC, et al*., CG
Docket No. 02-278, Declaratory Ruling, FCC 16-72, (July 5, 2016)          29, 30

**Statutes**

28 U.S.C. § 2342(1)                                                       10, 14

47 U.S.C. § 227, et. seq.                                                  2

47 U.S.C. § 227(a)(1)                                                     12, 20

47 U.S.C. §227(b)(1)(A)(iii)                                              2, 11, 28

47 U.S.C. § 402(a)                                                        10

**Other Authority**

31 *Federal Practice & Procedure: Evidence* § 7105                        3

## I.  INTRODUCTION

Plaintiff Baker was named by her brother as a reference on a student loan that was serviced by Defendant Navient Solutions, LLC ("Defendant" or "NSL").  NSL Undisputed Fact (UF) No. 3 , 4.  On November 7, 2016, NSL called Baker on her cell phone (Cell No. 0503) seeking contact or whereabouts information on her brother and to request that Baker relay a message from NSL.  NSL UF No. 5; **Exhibit 1**, NSL's Resp. to Ptf's 1st Set of Reqs. for Admmissions, Adm'n. ("Adm'n") Nos. 1, 13, 30, 32.  During that call, Baker demanded, "don't call me anymore please" and "I'm requesting that you remove me from the list." Ex. 1, Adm'n. Nos. 8, 9.  Despite Baker's demand, NSL made three more calls to Cell No. 0503, all for the same purpose, on February 23, June 15, and July 17, 2017.  NSL UF No. 5; Ex. 1, Adm'n. Nos. 37, 49, 66, 68, 73, 88, 105, 107, 113, 122, 139, 141. [The four calls to Cell No. 0503 shall be referred to as the "Four Telephone Calls"].  In each of the Four Telephone Calls, Baker demanded  that NSL stop calling.  Ex. 1, Adm'n. Nos. 10, 46, 85, 119.

Baker was the subscriber (and primary and customary user) of Cell No. 0503 beginning in 2003.  **Exhibit 2**, excerpts from Denise Baker deposition ("Baker Dep,"), 30:11-19; 32:5-14.  More recently, following her marriage in 2014, Cell No. 0503 was added to a family account with her husband.  Ex. 2. Baker Dep. 43:19-21.  Neither Baker nor her husband provided NSL with Cell No. 0503, and neither of them authorized Baker's brother or any other person to do so.  Ex. 2, Baker Dep. 34:23-35:2; 35:12-14.  Neither Baker nor her husband authorized NSL to call Cell No. 0503.  Ex. 1, Adm'n Nos. 4, 6, 40, 42, 76, 78, 115, 117.

On October 16, 2017, Baker filed this action, on behalf of herself and similarly situated individuals, against NSL for alleged violations of the Telephone Consumer Protection Act

1

("TCPA"), 47 U.S.C. § 227, *et seq.*  Dkt. #1.  Specifically, Baker alleged that NSL violated § 227(b)(1) (A)(iii) which makes it unlawful to make any non-emergency call using any automatic telephone dialing system ("ATDS" or "Autodialer") to any telephone number assigned to a cellular telephone service without the prior express consent of the called party.  *Id.*

The central issue raised by Defendant's motion is whether the telephone dialing system used by NSL to make the Four Telephone Calls was an ATDS.

## II.  STATEMENT OF DISPUTED FACTS

1.      Plaintiff does not dispute NSL's UF No. 1.

2.      Plaintiff disputes NSL UF No. 2 to the extent that it may suggest that the relief mentioned therein is all the relief sought by Plaintiff.  *See* Dkt. #1, Sec. VII, p 22.

3-7.    Plaintiff does not dispute NSL's UF Nos. 3-7.

8.      Plaintiff does not understand the term "'Dial Now' technology" used by NSL in its UF No. 8.[1]  That said, Plaintiff has no specific knowledge with which to dispute the representation of Joshua Dries that NSL used a dialing mode that Mr. Dries refers to as "Dial Now" to make the Four Telephone Calls to Ms. Baker.

9.      *See* ftn. 1 and accompanying test. That said, Plaintiff does not dispute the

---

[1]The only documents produced by NSL in discovery that refer to the term "Dial Now" were some Noble Systems manuals and a training manual, prepared by and for the use of two other, non-NSL legal entities.  **Exhibit 3**, excerpts from Joshua Dries deposition ("Dries Dep.") 26:22-27:7; **Exhibit 4**, excerpts from Ray Horak deposition ("Horak Dep.") 46:11-47:6. However, it is undisputed that the Four Telephone Calls were made using an Interaction Dialer system, not a Noble Dialer system.  Ex. 1, Adm'n Nos. 14, 18, 50, 54, 89, 93, 123, 127. Moreover, despite request, NSL has not produced any documentation evidencing the customization of any hardware or software used to make calls in the "Dial Now" dialing mode and did not provide any to its own expert witness.  *See* Ex. 4, Horak dep., 25:11-26:10; 27:8-17; 28:23-29:8.  As to the training guide mentioned by Horak, NSL's own counsel acknowledged that it "doesn't relate to anything in this case."  Ex. 3, Dries Dep., 90:8-95:8.

allegation in UF No. 9 that the Dial Now dialing mode, as described by Mr. Dries, involves human intervention.

10.     *See* ftn. 1 and accompanying text.  Plaintiff disputes UF No. 10 to the extent that it suggests that a customer service agent "dials" each call.  Rather, the agent manually inputs a telephone number into Artiva, Ex. 4. Horak Dep.69:5-70:20; Ex. 3. Dries Dep. 33:1-14, which is a database, not a dialer, and does not have any dialing software.  Ex. 4, Dries Dep. 17:14-18.

11.     Plaintiff disputes the conclusory allegation in UF No. 11.  *See also* ftn. 1 and accompanying text.

12.     *See* ftn. 1 and accompanying text.  That said, Plaintiff does not dispute that the Dial Now dialing mode, as described by Mr. Dries and other NSL witnesses, does not use any predictive or other kind of algorithm.  *But see* Ex. 1, Adm'n Nos. 24, 60, 99, 133.

13.     Plaintiff does not dispute NSL's UF No. 13.  *But see* Section V(A)(1) *infra.*

14-15.  Plaintiff does not dispute NSL's UF No. 14-15.

### III.  STATEMENT OF OMITTED UNDISPUTED FACTS[2]

[2]Among the exhibits attached to this Response are excerpts from the ININ Interaction Dialer Manager Help manual, Ver. 4.0 and the Genesys Interaction Dialer Manager Printed Help, Ver. 2018R1. Both manuals were produced by NSL in discovery and, as such, are sufficiently authenticated for summary judgment purposes.  As noted by the Court in *Jones v. Chapman*, 2017 U.S. Dist. LEXIS 64781 (D. Md. 2017):

> Defendants "cannot have it both ways. They cannot voluntarily produce documents and implicitly represent their authenticity and then contend they cannot be used by the Plaintiffs because the authenticity is lacking."

*Id.* at *10, quoting *Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, 1998 WL 1988826, at *6 (S.D. Ind. 1998), *aff'd*, 187 F.3d 743 (7th Cir. 1999).  *See also Law Co. v. Mohawk Constr. & Supply Co.*, 577 F.3d 1164, 1170-71 (10th Cir. 2009); *Maljack Prods. v. Goodtimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996); *Snyder v. Whittaker Corp.*, 839 F.2d 1085, 1089 (5th Cir. 1988); 31 *Fed. Prac. & Proc.: Evidence* § 7105, at 39.

16.     Each of the Four Telephone Calls was made using a telephone dialing system that included as one of its parts or components hardware, software or a combination of hardware and software known as an Interactive Intelligence (ININ) Interaction Dialer.  Ex. 1, Adm'n Nos. 14, 50, 89, 123.

17.     The telephone dialing system that was used to make each of the Four Telephone Calls included as one of its parts or components, or was used in conjunction with, an ININ Customer Interaction Center (CIC) server.  Ex. 1, Adm'n. Nos. 18, 54, 93, 127.

18.     At the time that each of the Four Telephone Calls were made, the ININ CIC server and the Interaction Dialer that were used to make each of the Four Telephone Calls had a standard Outbound Dialing Server (ODS) feature license installed.  Ex. 3, Dries Dep., 48:2-8; 48:22-49:13, 50:7-13; 56:8-19; Ex. 4, Horak Dep., 94:12-95:19; 96:14-25.

19.     At the time each of the Four Telephone Calls was made, the Interaction Dialer that was used to make each of the Four Telephone Calls had the present capacity or capability to conduct various dialing modes including predictive, power (or progressive), agentless and preview.  Ex. 7, ID Manual, Ver 4.0 at NSL  DB  235-238, 449; Ex. 5, ID Manual, Ver. 2018R1 at NSL  DB  6687-6688, 6994-6995, 7078-7082; Ex. 3, Dries Dep. 48:22-49:7; Ex. 1, Adm's. Nos. 24, 60, 99, 133.

20.     Predictive dialing, power or progressive dialing, agentless dialing and timed preview dialing are all automatic dialing modes that do not involve human intervention.  Ex. 4, Horak Dep., 108:15-109:1.

21.     An ININ Interaction Dialer server equipped with a Manual Calling Server (MCS) feature license does not have the ability to conduct predictive, power or progressive, agentless or

timed preview dialing or any other form of automatic dialing.  Ex. 5, ID Manual, Ver. 2018R1 at

NSL_DB_6990-6995; Ex. 3, Dries Dep. 49:8-13.

22.    The MCS and ODS feature licenses are mutually exclusive.  In other words, you

can only have one feature license installed on the ININ (or Genesys) CIC server and Interaction

Dialer subserver at a time.  **Exhibit 5**, Genesys Interaction Dialer Manager Printed Help manual,

Ver. 2018 R1 ("ID Manual, Ver. 2018R1"), at NSL_DB_0006995.  *See also* Ex. 3, Dries Dep.

50:7-23; Ex. 4, Horak Dep., 95:13-19.

23.    A calling agent cannot be simultaneously logged an Interaction Dialer with a

standard ODS license and another Interaction Dialer with a MCS license.  Ex. 4, Horak Dep.,

36:5-23.

24.    At the time that each of the Four Telephone Calls were made, the ININ CIC server

and Interaction Dialer subserver that were used to make each of the Four Telephone Calls did not

have a MCS feature license installed thereon.  Ex. 3, Dries Dep. 56:8-19 *coupled with* Ex. 1,

Adm'n Nos. 21-24, 57-60, 96-99, 130-133.

25.    To employ the Dial Now dialing mode as described by NSL's witnesses, a calling

agent who is participating in a predictive dialing campaign need only pause the campaign by

selecting "pause" on the toolbar on his or her computer screen.  **Exhibit 8**, excerpts from

deposition of Gladys L, Dixon ("Dixon Dep.") 32:23-34:9; **Exhibit 9**, excerpts from deposition

of Donna M. Jones ("Jones Dep.") 57:13-59:23.  *See also id.* at 44:17-23.  When the Dial Now

call is ended, the agent is returned to the predictive dialing campaign.  Ex. 8, Dixon Dep. 32:23-

34:9

26.    The Artiva database or DBMS is not a telephone dialer, and it does not have its

5

own dialing software.  Ex. 4, Horak Dep., 17:14-18.

27.     In the Dial Now dialing mode, when a NSL calling agent manually inputs a telephone number into the box on his computer screen, the calling agent is communicating with the Artiva database or DBMS.  Ex. 4, Horak Dep., 69:5-70:20; Ex. 3, Dries Dep., 33:1-14.

28.     When, after entering the telephone number in the box, the calling agent clicks "Dial Now" from the drop down menu, Artiva passes the telephone number to a middle layer called Artiva Web Services or AWS.  AWS then does some dial eligibility checks, evaluates the request for making sure that it's a valid number and things of that nature.  Ex. 3, Dries Dep., 34:8-25; Ex. 4, Horak Dep., 78:14-79:3.

29.     If the eligibility checks are successful, then Atriva passes the telephone number to the ININ CIC server and Interaction Dialer server through which the call is made.  Ex. 3, Dries Dep., 36:16-37-1.  If the eligibility checks are unsuccessful, Artiva does not pass the telephone number to the CIC server, and no call is dialed.  Ex. 4, Horak Dep., 79:23-80:3.

30.     The ININ CIC server and Interaction Dialer subserver used to make each of the Four Telephone Calls to Baker was capable of running a predictive dialing campaign immediately before the commencement of and immediately after the conclusion of the outbound dialing campaigns in which the Four Telephone Calls were made.  Ex. 1, Adm'n. Nos. 21, 22, 57, 58, 96, 97, 130, 131.

31.     The ININ CIC server and Interaction Dialer subserver used to make the Four Telephone Calls to Baker had the capability of running one or more outbound predictive dialing campaigns at the same time as each of the Four Telephone Calls was made.  Ex. 1, Adm'n. Nos. 24, 60, 99, 133.  See also id., Adm'n. Nos. 23, 24, 59, 60, 98, 99, 132, 133, and Ex. 3, Dries Dep.

6

48:2-8.

## IV.   STANDARD OF REVIEW

"In determining whether the grant of summary judgment [is] appropriate, [a court] must 'view the evidence in the light most favorable to the nonmoving party' and refrain from 'weigh[ing] the evidence or mak[ing] credibility determinations.'" *Lee v Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) quoting *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015).

## V.   ARGUMENT

**A.     Two red-herring arguments offered by NSL should be rejected.**

**1.     Plaintiff need not offer expert testimony to prevail on the ATDS issue.**

Although many TCPA plaintiff's have relied upon expert testimony to prove the use of an ATDS, it is not required. *Manuel v NRA Grp., LLC*, 200 F. Supp. 3d 495, 501-02 (M.D. Pa. 2016), *aff'd* __ Fed. Appx. __, 2018 WL 388622 (3rd Cir 2018); *Gillard v Receivables Perform. Mgmt., LLC*, 2015 WL 3456751, *4 (E.D. Pa. 2015); *Davis v. Diversified Consul'ts, Inc.*, 36 F. Supp. 3d 217, 225 n. 11 (D. Mass. 2014). *See also Echevvaria v. Diversified Consul'ts Inc.*, 2014 WL 929275 (S.D.N.Y. 2014). Moreover, numerous cases have found that a TCPA plaintiff can prove or create an issue of fact as to the use of an ATDS through a defendant's own witnesses and documents. *See e.g. Brown v. NRA Grp., LLC*, 2015 WL 3562740, *3 (M.D. Fla. 2015); and *Castro v. Green Tree Serv., LLC*, 959 F. Supp. 2d 698, 720 (S.D.N.Y. 2013).

In this case, Plaintiff will prove that NSL used an ATDS to make the Four Telephone Calls to Baker through the dialer manuals produced by NSL in discovery; through the testimony of Steven Bousarma, the 30(b)(6) representative of the Interaction Dialer's manufacturer; and

through the testimony of NSL's own witnesses.  *See* Section V(C)&(D).

The more significant question is why did NSL not make the report of its expert, Ray Horak, an exhibit to its motion for summary judgment.  The answer is that, although Horak's report suggested that he physically inspected the ININ CIC server and Interaction Dialer subserver used to call Ms. Baker, his deposition testimony revealed otherwise.  Horak's expert opinion was based upon a visit to NSL's <u>Muncie, Indiana</u> call center, <u>eight months **before** Plaintiff's action</u>, in connection with an arbitration proceeding filed by <u>a borrower</u> who was called by NSL using <u>a Noble dialer</u>.  <u>Ex. 4, Horak Dep., 10:23-11:2; 12:3-14:23</u>.  By contrast, Plaintiff was called as a <u>reference</u>, using the <u>ININ CIC server and Interaction Dialer subserver</u> , that is housed in <u>Fishers, Indiana</u>. *Id.* at 14:15-23. *See also id.* at 34:24-35:24.

### 2.    Use of a manual dialing mode is not determinative on the ATDS issue.

NSL maintains that it made all calls to references, including Ms. Baker, using a manual mode of dialing that it refers to as "Dial Now."  Based on this assertion and without further examining the capacities of the Interaction Dialer telephone dialing system used to make the calls, NSL leaps to the conclusion that Four Telephone Calls were not made using an ATDS. One court in which the same argument was made stated:

> [T]he Court notes that because the question revolves around capacity and not actual performance, Defendants' argument that the telephone call at issue here was manually dialed is irrelevant.  Defendants argue that the statute penalizes using an ATDS, but that the statute does not apply because CCCS used the equipment to manually dial Grider. <u>This argument ignores or at least dramatically misconstrues *Satterfield*.  Either way, Defendants are encroaching on the bounds set under Federal Rule of Civil Procedure 11(b)(2)</u>.

*Bates v. Dollar Loan Ctr., LLC*, 2014 WL 3516260, *2 (D. Nev. 2014) (emphasis added)

(footnotes omitted).

In deciding the ATDS issue, this court must distinguish between the question of <u>whether an ATDS was used</u> to make a call as opposed to <u>whether the autodialer functions of an ATDS was used</u> to make that call.  Perhaps the first case to illustrate the difference was *Nelson v. Santander Consumer USA, Inc.*, 931 F. Supp. 2d 919, *vacated by joint motion following settlement*, 2013 U.S. Dist. LEXIS 142699 (W.D. Wis 2013).  There, the telephone dialing system that was used to call the plaintiff could operate both in an automated mode known as predictive dialing and in a manual mode known as preview dialing.  In predictive dialing mode, the dialer dialed the call, without human intervention, based on an algorithm that predicted when a calling agent would become available.  In preview dialing mode, the dialer presented the calling agent with a telephone number to be called, but did not launch the call.  That task was performed by the calling agent who had the option to select the phone number presented and to dial the call, or to pass on the number presented and go to the next number.  In *Nelson*, the defendant argued that the plaintiff had failed to prove TCPA liability because "plaintiff has failed to show which calls [defendant] made to her through predictive dialing and which calls it made through 'preview dialing,'" *Id.* at 930.  The court rejected the argument, responding:

> Under both the statute and the order, <u>the question is not how the defendant made a particular call</u>, but whether the system it used had the "capacity" to make automated calls. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) . . . Because it is undisputed that Nightengale's testimony establishes that capacity, I conclude that plaintiff is entitled to summary judgment on this claim.

*Id.* (emphasis added).

In its 2015 Declaratory Ruling, the FCC adopted the position of the vacated *Nelson* decision (without mentioning it by name) when it stated:

> [T]he fact that the TCPA bars callers from using autodialers to "make any call" does not

9

mean that the equipment must be configured such that every functionality contained in the statutory definition of "autodialer" is installed and active at the time calls are made and that the caller must actually be using those functionalities to place calls in order for the TCPA's consent requirements to be triggered. . . . Instead, when a caller places a call using equipment that has the requisite "capacity" (as we construe the term here), the equipment is an autodialer and a caller using it "makes" a call "using an automatic telephone dialing system" under section 227(b)(1)(A).

*In re Rules and Regulations Implementing the Tel. Cons. Prot. Act of 1991*, 30 FCC Rcd. 7961

(2015) (2015 Declaratory Ruling), ¶ 19, n.70.

Recently, the D.C. Circuit Court of Appeals in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C.

Cir. Mar. 16, 2018) took note of the FCC's position:

"It shall be unlawful for any person ... *to make any call* (other than a call made for emergency purposes or made with the prior express consent of the called party) *using any automatic telephone dialing system* ... to any telephone number assigned to a ... cellular telephone service[.]"  *Id.* § 227(b)(1)(A)(iii) (emphases added).

. . . [I]n the case of a device having the "capacity" both to perform the autodialer functions set out in the statutory definition and to perform as a traditional phone, does the bar against "making any call using" an ATDS apply only to calls made using the equipment's ATDS functionality?  Or does the bar apply to all calls made with a device having that "capacity," even ones made without any use of the equipment's autodialer capabilities?  Or does the bar apply to calls made using certain autodialer functions, even if not all of them?  <u>The Commission's ruling endorsed a broad understanding under which the statute prohibits any calls made from a device with the capacity to function as an autodialer, regardless of whether autodialer features are used to make a call</u>.

*ACA Int'l*, 885 F.3d at 703-04 (italicized emphasis in original; underlined emphasis added).

As the petitioners had not challenged the FCC's position on this point, *ACA Int'l* declined to

address the issue further and did not vacate that portion of the 2015 Declaratory Ruling.

Pursuant to the Hobbs Act, this Court has no jurisdiction to question the FCC's 2015

Declaratory Ruling on this issue.  *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a).  Even if the

Court were to believe that the FCC's interpretation is clearly wrong, or that the FCC acted

outside its authority, the Hobbs Act bar is absolute, depriving the Court of Article III jurisdiction to so much as consider whether the FCC's interpretation is correct. *GTE South, Inc. v. Morrison*, 199 F.3d 733, 742-43 (4th Cir. 1999) (holding that "a challenge to an FCC order is subject only to *direct* review in a court of appeals") (emphasis in original).[3]

As noted in *Bates*, whether the particular calls to Ms. Baker were made manually is irrelevant to the issue of whether the Interaction Dialer telephone dialing system used to make the calls was an ATDS.  In order to fall outside the prohibitions of the TCPA, a telephone dialing system must only make manual calls.  Restated, it must not have the *capacity* to also make calls in predictive or other automated modes.  *See* Section V(D).  That is not the case with regard to the Interaction Dialer telephone dialing system used by NSL to call Ms. Baker.[4]

**B.      Preliminary background discussion relevant to the ATDS issue.**

**1.      The statutory definition of ATDS and the 2003 and 2008 FCC Orders**.

The TCPA makes it unlawful for any person "(A) to make any call . . . using any automatic telephone dialing system . . . (iii) to any telephone number assigned to a . . . cellular telephone service . . . unless such call is made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii).  The statute defines "automatic telephone dialing system" as "equipment which has the capacity - (A) to store or produce telephone

---

[3] *See also FCC v. ITT World Commc'n, Inc.*, 466 U.S. 463, 468-469 (1984); *Baisden v. Credit Adjustm'ts, Inc.*, 813 F.3d 338, 342 (6th Cir. 2016);  *Blow v. Bijora, Inc.*, 855 F.3d 793, 802 (7th Cir. 2017);  *Nack v. Walburg*, 715 F.3d 680, 685-86 (8th Cir. 2013); *Mais v. Gulf Coast Collect'n Bur., Inc.*, 768 F.3d 1110, 1121 (11th Cir. 2014).

[4] Although NSL had the option to equipping its Interaction Dialer with an MCS feature license that would have only permitted manual dialing, Ex. 3, Dries Dep. 49:8-13, it chose not to do so. Ex. 3, Dries Dep., 54:12-16; 55:12-15; 56:1-19.  *See also* Ex. 1, Adm'n. Nos. 21-24, 57-60, 96-99, 130-133.

numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).

In 2003, the FCC found that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress."  *In re Rules and Regulations Implementing the Tel. Cons. Prot. Act of 1991*, 18 FCC Rcd. 14,014 ("2003 Order") ¶ 133 (2003).  In its 2003 Order, the FCC stated:

> The record demonstrates that a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls.  The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. . . . The principal feature of predictive dialing software is a timing function, not number storage or generation.

*Id.* at ¶ 131.  The FCC further explained its finding:

> The statutory definition contemplates autodialing equipment that either stores or produces numbers. . . . In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. . . . [T]he evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective.  The basic function of such equipment, however, has not changed - the *capacity* to dial numbers without human intervention.

*Id.* at ¶ 132 (emphasis in original).  In 2008, the FCC reaffirmed its 2003 finding that a predictive dialer is an ATDS.  *In re Rules and Regulations Implementing the Tel. Cons. Prot. Act of 1991*, 23 FCC Rcd. 559 ("2008 Declaratory Ruling") ¶¶ 12, 14 (2008).  The 2003 Order and the 2008 Declaratory Ruling, together, shall be referred to as the 2003 and 2008 Orders.

## 2. The 2015 Declaratory Ruling.

By petition to the FCC in 2014, ACA International ("ACA") urged the FCC to confirm that not all predictive dialers are categorically automatic telephone dialing systems and that "capacity" under the TCPA means present ability.  Petition for Rulemaking of ACA

International (filed Feb. 11, 2014), *available at* https://ecfsapi.fcc.gov /file/7521072801.pdf.

In 2015, in response to the petitions of ACA and others, the FCC stated:

> We reaffirm our previous statements that dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of "autodialer") even if it is not presently used for that purpose, including when the caller is calling a set list of consumers. We also reiterate that predictive dialers, as previously described by the Commission, satisfy the TCPA's definition of "autodialer" for the same reason. We also find that callers cannot avoid obtaining consent by dividing ownership of pieces of dialing equipment that work in concert among multiple entities.

2015 Declaratory Ruling, ¶ 10.

In the 2015 Declaratory Ruling, the FCC attempted to clarify its analysis of what constitutes an ATDS by expounding on the term "capacity" in the ATDS definition. In so doing, the FCC rejected the argument that "capacity" was limited to "present ability." Instead, the FCC adopted a broad interpretation of the term that was only limited in the extreme:

> [A]lthough the Commission has found that a piece of equipment can possess the requisite "capacity" to satisfy the statutory definition of "autodialer" even if, for example, it requires the addition of software to actually perform the functions described in the definition, there must be more than a theoretical potential that the equipment could be modified to satisfy the "autodialer" definition. Thus, for example, it might be theoretically possible to modify a rotary-dial phone to such an extreme that it would satisfy the definition of "autodialer," but such a possibility is too attenuated for us to find that a rotary-dial phone has the requisite "capacity" and therefore is an autodialer.

2015 Declaratory Ruling ¶ 18.

ACA and others argued that the FCC's broad interpretation of "capacity" in the 2015 Declaratory Ruling "could potentially sweep in all smartphones because they may have the capacity to store telephone numbers to be called and to dial such numbers through the use of an app or other software." *Id.* at ¶ 21. The FCC was dismissive, stating, "there is no evidence in the record that individual consumers have been sued based on typical use of smartphone technology.

13

. . .  We will continue to monitor our consumer complaints and other feedback, as well as private litigation, regarding atypical uses of smartphones, and provide additional clarification if necessary." *Id.*

Multiple appeals of the FCC's 2015 Declaratory Ruling were filed in several circuit courts of appeal.  The appeals were transferred to and consolidated in the D.C. Circuit Court of Appeal.  On March 16, 2018, that court rendered its decision in *ACA International* which "set aside . . . the Commission's effort to clarify the types of calling equipment that fall within the TCPA's restrictions."  *ACA Int'l*, 885 F.3d at 692.

### 3.    *ACA Int'l* did not vacate the 2003 or 2008 Orders.

The only matter before the D.C. Circuit in *ACA Int'l* was a Hobbs Act appeal from the 2015 Declaratory Ruling.  In a Hobbs Act appeal, a court of appeal has authority "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" final FCC orders.  28 U.S.C. § 2342.  The Hobbs Act does not give a court jurisdiction to do more than this.

In its opening paragraphs, the D.C. Circuit in *ACA Int'l* states:

> In this case, a number of regulated entities seek review of a 2015 order in which the Commission sought to clarify various aspects of the TCPA's general bar against using automated dialing devices to make uninvited calls. The challenges encompass four issues addressed by the agency's order: (i) which sorts of automated dialing equipment are subject to the TCPA's restrictions on unconsented calls …
> * * *
> We set aside . . . the Commission's effort to clarify the types of calling equipment that fall within the TCPA's restrictions.

*ACA Int'l*, 885 F.3d at 691-92 (emphasis added).  Similarly, in the introduction to the ATDS discussion, the court says:

> Applying [the Administrative Procedure Act's] standards to petitioners' four sets of challenges to the Commission's 2015 Declaratory Ruling, we set aside the Commission's

explanation of which devices qualify as an ATDS.

*ACA Int'l*, 885 F.3d at 695 (emphasis added).  *See also id.* at 703.

*ACA Int'l* thus does no more regarding the ATDS definition than to set aside certain portions of the FCC's 2015 order that dealt with that definition.  The D.C. Circuit's decision is best viewed as rolling the clock back to 2014, before the FCC had issued the portions of its 2015 order that relate to the definition of an ATDS.  In 2014, the TCPA was in place, and the FCC's 2003 and 2008 Orders, which included interpretations of the term ATDS, were also in place.

The D.C. Circuit's brief references to the 2003 and 2008 Orders in *ACA Int'l* do nothing to undermine the conclusion that the opinion decided only the validity of the 2015 Order.  Except for a brief mention of the 2003 Order in an introductory section, *ACA Int'l* mentions the 2003 and 2008 Orders only in section II(A)(2).  Section II(A)(2) first addresses the question whether the existence of the 2003 and 2008 Orders deprived the D.C. Circuit of jurisdiction to entertain the challenge to the 2015 Order.  This was a necessary prerequisite for the court to address the 2015 Order.  The section, while it refers to the previous orders, makes it clear that the court's ruling addresses only the 2015 Declaratory Ruling and the additional interpretations provided in that order.  Nothing in the court's opinion purports to expand the scope of the D.C. Circuit's review to the 2003 and 2008 Orders.

*ACA Int'l*'s failure to vacate or otherwise impact the 2003 and 2008 Orders was recently recognized in *Reyes v. BCA Fin. Servs., Inc.*, 2018 WL 2220417 (S.D. Fla. May 14, 2018) where the court stated, "[T]he *ACA International* case does not change the Court's conclusion on the ATDS issue [i.e. that a predictive dialer is an ATDS]."  *Id.* at *11.  The court explained its decision thus:

15

. . .  BCA Financial reads too much into *ACA International* when it concludes that the prior FCC orders can no longer be relied upon. The Court rejects that argument for several reasons.  First, nowhere in the D.C. Circuit's opinion are the prior FCC orders overruled.  Indeed, that would have been impossible given that the time to appeal those orders had long passed. And when addressing those prior orders, the D.C. Circuit merely said that it had jurisdiction to address the recent pronouncements and clarifications issued in 2015, not whether the 2003 and 2008 orders remained valid.

Second, when the D.C. Circuit said that the FCC had provided too expansive an interpretation of the TCPA, the D.C. Circuit was not referring to the prior or recent rulings equating predictive dialers to ATDSs.  Rather, the D.C. Circuit was referring to the FCC's interpretation of the TCPA as encompassing devices that have both the present and *future* capacity to acts as ATDSs. . . .

In this case, however, there is no issue concerning the Noble predictive dialer's present versus future capacity.  Although BCA Financial disputes that the Noble predictive dialer is an ATDS, the issue is not whether BCA Financial may *later* convert it into an ATDS. That is not Reyes' theory of liability.  Rather, it is that the Noble predictive dialer *is* an ATDS as *currently* configured and utilized.  Therefore, the 2015 FCC order concerning present versus future capacity would not have had an impact in this case anyway, let alone *ACA International*'s decision concerning that issue.

*Id.* at *11-12 (emphasis in original).  The court concluded, "[A]bsent an express rejection of the

prior FCC orders, the Court cannot deviate from them and impose my own interpretation of the

TCPA."  *Id.* at *12.

As in *Reyes*, it is Plaintiff's theory of liability that the Interaction Dialer used to call Ms.

Baker was a predictive dialer - and, as such, an ATDS - as it was configured at the time of the

calls to Ms. Baker, not that it had the future capacity to become an ATDS through modification.

Thus, the role of this Court after *ACA Int'l* is to interpret the TCPA in light of the 2003 and 2008

Orders, the decisions of the Fourth Circuit, and any decisions of other courts that have persuasive

value, but without the benefit of the 2015 Declaratory Ruling on this point.

**C.    NSL used an ATDS to make the Four Telephone Calls to Baker.**

NSL has identified the ININ Interaction Dialer as the dialer used to make the Four

Telephone Calls to Ms. Baker.  Ex. 1, Adm'n. Nos. 14, 50, 89, 123.

**1.    The Interaction Dialer telephone dialing system used to call Ms. Baker is a predictive dialer and, as such, an ATDS under the 2003 and 2008 Orders.**

In its 2003 Order, the FCC offered its definition of a predictive dialer and found that "a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress."  2003 Order ¶ 133 (2003).  *See also* Section IV(B)(1).  The FCC reaffirmed this finding in 2008.  2008 Declaratory Ruling ¶¶ 12, 14.  As discussed in Section IV(B)(3), these prior FCC orders were not vacated or otherwise impacted by *ACA Int'l*.

There is no doubt that the Interaction Dialer telephone dialing system used to make the Four Telephone Calls to Baker is an ATDS.  The Interaction Dialer manuals are clear:

**Automatic Predictive Outbound Dialer**
Interaction Dialer's primary purpose is efficient placement of outbound calls.  Interaction Dialer is both an automated dialer and a predictive dialer.  It supports supplemental dialing for added flexibility.

**Automatic Dialing**
. . . Interaction Dialer automates [the dialing] process by automatically selecting the person to call, dialing the number, and routing the call to an agent if a live person answers. . . . Interaction Dialer retrieves telephone numbers from a call queue. . . .

**Predictive Dialing**
*Predictive dialing* refers to the process of placing outbound calls, based upon the prediction that an agent will be available at some time in the future once a connection with a person is achieved.

Interaction Dialer uses an advanced predictive algorithm to forecast when agents will become available.  It automatically adjusts the pace of dialing to keep agents busy while maintaining abandon rate goals.

Ex. 7, ID Manual 4.0 at NSL_DB_235-236 (italicized emphasis in original; underlined emphasis added); Ex. 5, ID Manual, 2018R1 at NSL_DB_7078-7079.

The three calling agents who made the Four Telephone Calls to Ms. Baker, described

17

predictive dialing without using the technical term." **Exhibit 10**, excerpts from deposition of Timothy Murphy ("Murphy Dep.") 8:2-17 ("So they do have a thing where if you are just sitting there, a phone call can pop in without me calling."); Ex. 9, Jones Dep. 10:24-11:6; 11:12-22; 13:2-6; 13:22-14:16 ("the numbers are preselected, so you are on a campaign . . . and it dials for you."); Ex. 8, Dixon Dep. 16:4-7; 17:19-18:13; 24:17 ("[W]hen the system dialed a number without me having to do anything, I just referred to it as we are on the dialer.").

Among the supplemental dialing supported by the Interaction Dialer are power dialing, precise dialing, agentless and preview dialing and timed preview dialing. Ex. 7, ID Man. Ver 4.0. at NSL_DB_236-38; 449; Ex. 5, ID Man., Ver, 2018R1 at NSL_DB_6687-88, 7079-82. Both predictive dialing and all of these supplemental dialing modes (with the exception of preview dialing) are automatic and do not involve any human intervention according to NSL's own expert witness. Ex. 4, Horak Dep., 108:15-109:1.

According to NSL's expert, a calling agent cannot be logged onto two different telephony systems at the same time. Ex. 4, Horak Dep. 36:5-23. For instance, a calling agent could not be logged into an Interaction Dialer equipped with the standard ODS feature license (that permits predictive and other automated dialing) at the same time as he/she is logged into an Interaction Dialer equipped with a MCS feature license (that permits only manual dialing). The calling agents who called Ms. Baker testified that they logged into a single Interaction Dialer at the beginning of the day and logged off at the end of the day, without ever logging onto a second dialing system. Ex. 9, Jones Dep. 44:7-46:1. Ex. 8, Dixon Dep. 48:2-11, 49:4-50:21. They further testified that, when they were participating in a predictive dialing campaign and wished to make a manual "Dial Now" call, it was not necessary for them to log off of one dialing server

18

and onto another one.  _Id._  See also Ex. 10, Murphy Dep. 41:15-42:6.  Rather, they simply paused

the predictive dialing campaign by selecting the "pause" button from the toolbar, made the "Dial

Now" call, and returned to the predictive dialing campaign when the "Dial Now" call was

completed.  _Id._  Clearly, Dial Now calls did not require that a different dialer server be used.

And yet, there is some disagreement among Defendant's witness as to whether calls made

in the Dial Now mode are made using the Interaction Dialer itself or the CIC server, which is the

core component of the Interaction Dialer telephone dialing system, Ex. 4, Horak Dep., 50:21-

51:4, and actually houses the Interaction Dialer subserver.  _See_ Ex. 7, ID Manual, Ver. 4.0 at 246;

Ex. 5, ID Manual, Ver, 2018R1 at 7092.  According to Joshua Dries, NSL's Dialer Developer

Project Manager and Rule 30(b)(6) representative,[5] when the Dial Now calls are passed from

Artiva (the database management system) for dialing, they go through the CIC server and not

through the dialer itself. Ex. 3, Dries Dep., 36:16-37:9.  However, NSL's expert testified that the

CIC server can only process incoming calls.  Ex. 4, Horak Dep., 50:21-51:8; 52:2-6; 93:5-13.

Outbound calling requires that the Interaction Dialer be installed onto the CIC server as the dialer

subserver.  _Id._  Further, NSL has admitted that the same dialing server used to make the Four

Telephone Calls to Ms. Baker was also used to conduct predictive dialing campaigns at the same

time.  Ex. 1, Adm'n. Nos. 21-24, 57-60, 96-99, 130-133.  _See also_ Ex. 3, Dries Dep., 48:2-8.

Clearly, the Interaction Dialer used by NSL to make the Four Telephone Calls to Ms.

Baker is a predictive dialer.  As such, under the FCC's 2003 and 2008 Orders, both of which

remain intact after _ACA Int'l_, it is also an ATDS.

---

[5]Mr. Dries has only a high school education.  Ex. 3, Dries Dep., 10:23-11:4.  NSL did not
designate him as an expert in regard to telephony systems in general, or as to the Interaction
Dialer in particular.  Rather, NSL designated Ray Horak as its expert.

19

**2.      The Interaction Dialer telephone dialing system used to call Ms. Baker is an ATDS <u>under the statutory definition</u>.**

Separate and apart from the FCC's 2003 and 2008 Orders, the Interaction Dialer telephone dialing system used to make the Four Telephone Calls to Baker is an ATDS because it satisfies the statutory definition of an ATDS set forth in 47 U.S.C. § 227(a)(1).  That section reads as follows:

> (1) The term "automatic telephone dialing system" means equipment which has the capacity - (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.

The key to understanding the statutory definition of an ATDS lies with parsing the phrase "using a random or sequential number generator" within the context of the overall definition. To what other part of the ATDS definition does the phrase refer?

The preferred interpretation of defendants, and the one adopted by NSL, is that the phrase "using a random or sequential number generator" refers to both "store" and "produce."  Under this interpretation, an ATDS must either (1) store telephone numbers using a random or sequential number generator or (2) produce telephone numbers using a random or sequential number generator.  The first problem with this interpretation is that, as a practical matter, it writes the word "store" out of the statutory definition and thus violates the rule of statutory construction that all words must be given meaning if possible.  *Carroll v. Logan*, 735 F.3d 147, 150 (4th Cir. 2013).  As acknowledged by NSL's own expert witness, "storing numbers using a random or sequential number generator" is nonsensical.  <u>Ex. 4, Horak Dep. 110:7-20</u> ("[T]hat didn't [sic] make any sense," adding, "You would not store numbers using a random or a number -- or sequential number generator now or at any times.").  The second problem with this

20

interpretation is that it violates other cannons of statutory construction including the last

antecedent rule and the last reasonable referent rule. *Barnhart v. Thomas*, 540 U.S. 20, 26-28

(2003); *In re Bateman*, 515 F.3d 272, 277-78 (4th Cir. 2008). The last antecedent <u>and</u> the last

reasonable referent to the phrase "using a random or sequential number generator" is the word

"produce," not "store or produce." NSL's construction of the statutory definition of an ATDS

should be rejected.

If the phrase "using a random or sequential number generator" is interpreted as referring

only to "produce" (and not to "store"), then equipment can satisfy the statutory definition of an

ATDS if it has the capacity to:

(1)      store telephone numbers to be called and dial those numbers <u>or</u>

(2)      produce telephone numbers to be called, using a random or sequential number
          generator; and dial those numbers.

This interpretation gives meaning to all words in the definition and adheres to accepted

cannons of statutory construction. As an added bonus, it offers clarity to the FCC's finding that a

predictive dialer is an ATDS, as a predictive dialer certainly stores telephone numbers in a

database and dials those numbers using lists created from the database.

It is important to recognize that a database server is an essential component of the

Interaction Dialer telephone dialing system.[6]  **Exhibit 6**, excerpts from Steven Bousamra

---

[6]Both Genesys and NSL attempt to deny that the database or DBMS is a component of the
Interaction Dialer telephone dialing system on the basis that the database and its records are
supplied by the customer (NSL) and not by ININ or Genesys. *See* Ex. 6, Bousamra Dep., 64:10-
66:16. However, in a portion of its 2015 Declaratory Ruling that was not set aside, the FCC
made it clear that liability under the TCPA could not be avoided by separating the ownership of
the components of an ATDS:

[T]he Commission has recognized that various pieces of different equipment and

deposition ("Bousamra Dep."), 65:25- 66:3, 66:8-16 and Ex. 4, Horak dep., 62:16-64:8.  *See also*

**Exhibit 7**, ID Manual, Ver. 4.0 at NSL_DB_0000246-247 and Ex 5, ID Manual, Ver. 2018R1 at

NSL_DB_0007092-7093 (each stating that "[t]wo to three dedicated servers are required to

implement Interaction Dialer" including "[a] database [or DBMS] server.").

In this case, Artiva is the database and DBMS used in connection with NSL's private

student loans, Dkt. 44, Dries Dec. ¶3, and Scripts and Grids, is the database and DBMS used in

connection with federal student loans.  *Id.* at ¶5.[7]  "[A]ll the phone number records that will be

called during the [calling] campaign" are stored on Artiva (or Scripts and Grids) in a Contact

List.  Ex. 5, ID Manual, Ver. 2018R1 at NSL_DB_7117; Ex. 7, ID Manual, Ver 4.0 at

NSL_DB_267.  *See also id.* at NSL_DB_7120 and NSL_DB_269 ("The contact list table stores

the list of people who will be called in a campaign.").

The Interaction Dialer also ""dials" telephone numbers.  Ex. 4, Horak Dep. 105:15-

106:14, 108:15-109:1.  The typical dialing process, using the Recycle Table, is described below

in Section V(C)(3).  In predictive and other automatic modes, dialing occurs without the agent

doing anything but logging onto the system at the beginning of his or her shift. Ex. 3, Dries Dep.

24:14-25:2; Ex. 4, Horak Dep. 108:15-109:1; Ex. 8, Dixon Dep. 16:4-7; 17:19-18:13; 24:17;  Ex.

---

software can be combined to form an autodialer, as contemplated by the TCPA. The fact
that these individual pieces of equipment and software might be separately owned does
not change this analysis.

2015 Declaratory Ruling ¶¶ 23-24.

[7]In paragraphs 3 and 5 of his declaration, Mr. Dries refers to Artiva and Scripts and Grids
as a "receivables management system[s]."  However, in his deposition, Mr. Horak confirms that
Artiva is the database management system (DBMS) component of the Interaction Dialer
telephone dialing system upon which the Dialer relies as the source for the telephone numbers to
be called (in the case of the private loans).  Ex. 4, Horak Dep., 16:17-17:1; 61:14-18; 62:1-7.

9, Jones Dep. 10:24-11:6; 11:12-22; 13:2-6; 13:22-14:16; Ex. 10, Murphy Dep. 8:2-17.

Even the "Dial Now" mode involves the storing and dialing of telephone numbers by the

Interaction Dialer telephone dialing system.  When a calling agent uses the Dial Now method, he

or she (by one of three methods) is simply manually entering (re-entering if the number is already

listed in Artiva) a single telephone number into the Artiva database system.  Ex. 4. Horak

Dep.69:5-70:20; Ex. 3. Dries Dep. 33:1-14.  The telephone number is passed from Artiva to the

Interaction Dialer for dialing.[8]  Ex. 4. Horak Dep., 80:21-81:13; Ex. 3, Dries Dep. 36:16-37:1.

However, before that happens, Artiva (through its Artiva Web Service or AWS) performs

eligibility checks on the number and on the calling agent to be certain that the number is eligible

for calling and the agent is eligible to make the call.  Ex. 4, Horak Dep. 71:19-73:25; Ex. 3, Dries

Dep. 34:8-25.  Of necessity, it follows that the telephone number to be called is stored for a

period of time, however small, before it is passed on to the Interaction Dialer for dialing.[9]

As the Interaction Dialer telephone dialing system stores telephone numbers to be called

and dials those numbers, it is an ATDS under the statutory definition.

**3.      The Interaction Dialer telephone dialing system used to call Ms. Baker is an ATDS under an alternative interpretation of the statutory definition.**

Often the discussion of whether a telephone dialing system is an ATDS centers around

---

[8]Mr. Dries testified that Dial Now calls are passed to and dialed by the ININ CIC server (which houses the Interaction Dialer subserver), and not by the server itself. However, NSL's expert testified that the CIC server can only process incoming calls.  Ex. 4, Horak Dep., 50:21-51:8; 52:2-6; 93:5-13.  All outbound calling requires that the Interaction Dialer be installed onto the CIC server as the dialer subserver.  Id.  See also Section V(C)(1).

[9]The fact that the telephone number is not dialed immediately upon the agent's entry of the number into Artiva is evidenced by the fact that the number is never dialed if the eligibility checks are not passed.  Ex. 4, Horak Dep., 79:23-80:3.

whether it has the capacity to "<u>generate</u>" numbers using a random or sequential number generator.  And yet the word "generate" (as opposed to generator) is nowhere to be found in the statutory definition.  Rather the definition speaks of telephone numbers "<u>to be called</u>" using a random or sequential number generator.

One way to satisfy that requirement is to "generate" the telephone numbers to be called using a random or sequential number generator.  Another way is to use a random or sequential number generator <u>to determine the order</u> in which the telephone numbers are to be processed for calling.  That is the case with the Interaction Dialer.

Specifically, the Interaction Dialer allows for the ordering of the telephone numbers to processed for calling and does so using a Recycle Table which the dialer creates.  <u>*See*</u> <u>Ex. 7, ID Manual, Ver 4.0 at NSL_DB_274-275</u> ("At runtime, <u>Dialer</u> creates a recycle table . . . [that] holds sequencing for the current recycle,") and <u>Ex. 5, ID Manual, Ver. 2018R1 at NSL_DB_7134-7135</u> (same).  The Recycle Table consists of only two fields or columns.  The first, named "I3_IDENTITY," is used to join the Recycle Table with the Contact List containing the telephone numbers to be called.  The second, named "I3_SEQNO (<u>as in "sequential number</u>"), "stores the processing sequence number of each specific record within the recycle." <u>*Id.*</u> at NSL_DB_275 and NSL_DB_7135.  The manuals explain the process thus:

**Record Selection Process**

Dialer invokes a stored procedure to select contact list records for processing. It preps the contact list before every recycle. The procedure runs quickly since it is precompiled and resides in the database. When a campaign is started, reset, or recycled, the conceptual process is as follows:

1.     The procedure clears the contents of the recycle table.
2.     It reorders the contact list to apply sort criteria defined for the campaign.

24

3.  It queries the contact list to obtain a list of all contacts that can be called, based upon the Status of each record and the Campaign filter.

4.  The resulting row IDs are stored in the status table. The order in which the records are returned is used to populate the sequence ID field.

5.  Records are processed in i3_seqno order. . . .

6.  When a contact list record is routed to an Outbound Dialer server, its status is set to "I" to indicate that the record is in-process (for example: the record is being dialed or awaiting completion from the agent.) . . .. The Status field is updated again when the contact record is dispositioned. . . .

*Id.* at NSL_DB_275 and NSL_DB_7135.  *See also* Ex. 3, Dries Dep. 72:2-73:16, 74:13-81-24; Ex. 6, Bousamra Dep. 50:19-51:6.[10]

As is apparent from its name and the above discussion and the table illustration that appears on the pages cited above, the I3_SEQNO field in the Interaction Dialer's Recycle Table is populated using a sequential number generator (beginning with "0" and continuing with 1, 2, 3 etc.) and determines the order in which the telephone numbers are processed for calling. *Id.*  As such, the Interaction Dialer meets the statutory definition of an ATDS.[11]

**D.   The HCI and MCA cases on which NSL relies are distinguishable.**

NSL relies heavily upon two lines of cases, one involving the LiveVox Human Call Initiator (HCI), *Pozo v. Stellar Recovery Collection Agency, Inc.*, 2016 WL 7851415 (M.D. Fla. 2016); *Smith v. Stellar Recovery, Inc.*, 2017 WL 955128 (E.D. Mich. 2017); and *Arora*

---

[10]NSL's expert, Ray Horak, testified that knew that "there is such a thing" as a recycle table within the Interaction Dialer telephone dialing system, but lacked sufficient familiarity to testify about it. Ex. 4, Horak Dep. 111:25-112:13.

[11]It should be noted that the telephone numbers to be called may be sorted sequentially and processed in that order using the Recycle Table. Ex. 7, ID Manual Ver. 4.0 at NSL_DB_407 and Ex. 5, ID Manual Ver. 2018R1 at NSL_DB_7060 (each providing "PhoneNumber, Name DESC'" as a possible sort order). *See also* Ex. 7, ID Manual Ver. 4.0 at NSL_DB_709 and Ex. 5, ID Manual Ver. 2018R1 at NSL_DB_7296 (each explaining that sorting by phone number, while possible, can have a negative impact on idle time).

*Transworld Sys., Inc.*, 2017 WL 3620742 (N.D. Ill. 2017), and the other involving the Manual

Clicker Application (MCA), *Strauss v CBE Grp., Inc.*, 173 F. Supp. 3d 1302 (S.D. Fla. 2016),

*Marshall v. CBE Grp., Inc.*, 2018 WL 1567852 (D. Nev. 2018).  Both lines are distinguishable.

     *Pozo*, *Smith*, and *Aurora* are all distinguishable because, in this case, NSL admits that the

Four Telephone Calls were <u>not</u> made using any LiveVox HCI telephone dialing system.  <u>Ex. 1,</u>

<u>Adm'n Nos. 29, 65, 104, 138</u>.  More significantly, in all three cases, the courts found, based upon

the defendant's evidence that the LiveVox HCI system was **<u>not</u>** a predictive dialer.  Notably, the

court in *Pozo* observed, "LiveVox keeps the HCI software and hardware separate from and stored

on a different server than all automated dialing systems." *Pozo*, 2016 WL 7851415 at *4. The

court concluded, "[B]ecause Stellar's HCI system required its representatives to manually dial **<u>all</u>**

**<u>calls</u>** and was not capable of making **<u>any calls</u>** without human intervention, Stellar did not

employ an autodialer." *Id.* at * 6.  That is <u>not</u> the case with the Interaction Dialer system.

     The MCA line of cases, *Strauss* and *Marshall*, involve a Manual Clicker Application for

making manual calls.  Like Artiva, it appears that the MCA is not itself a dialer or have its own

dialing software.  Therefore, in *Strauss* and *Marshall*, one must look at the actual dialing system

that was paired with the MCA to determine whether it is or is not an ATDS.  In the case of

*Marshall*, the MCA was paired with a LiveVox cloud-based system.  *Marshall*, 2018 WL

1567852 at *5.  The defendant introduced evidence that "the specific LiveVox system used in the

instant case was designed to only launch calls through manual dial requests and is without the

potential to autodial," *id*., and the court found, "As to the LiveVox system in this case, Plaintiff

has failed to establish a genuine issue of material fact as to whether LiveVox has the capacity to

store or produce telephone numbers to be called, using a random or sequential number

generator." *Id.* at *6.  In *Strauss*, the MCA was paired with certain Noble "connecting devises" called Corphost1 and Corphost 2 that were "incapable of doing any type of automatic outbound calling," *Strauss*, 173 F. Supp. 3d at 1310, and was not a predictive dialer.  *Id.* at 1311.  In contrast, in this case, the testimony of both NSL's representative and expert is that if Artiva's eligibility tests were successful, the Dial Now number was passed to the  CIC server and Interaction Dialer (a predictive dialer) for actual dialing.  Ex. 4. Horak Dep., 80:21-81:13; Ex. 3, Dries Dep. 36:16-37:1  As such, both *Marshall* and *Strauss* are distinguishable.

E.    **Plaintiff has produced sufficient evidence of NSL's willfulness.**

Since 2003, the law has been clear that a predictive dialer is an ATDS. Plaintiff has produced sufficient evidence that the Interaction Dialer telephone dialing system used to call Ms. Baker is a predictive dialer. *See* Section V(C)(1). Moreover, since July 10, 2015, it has been clear that *any call* made using an ATDS, *even a manual call that does not use the autodialer functionalities of that ATDS*, violates the TCPA. 2015 Declaratory Ruling, ¶ 19, n.70; *ACA Int'l*, 885 F.3d at 703-04. *See also*  Section V(A)(2). NSL correctly believed that Cell No. 0503 was assigned to a cell phone, Ex. 1, Adm'n. Nos.  11, 47, 86, 120, and yet NSL made no effort to obtain consent from Ms. Baker, *see id.*, Adm'n. Nos. 4, 6, 40, 42, 76, 78, 115, 117, *or from any of the putative class members called as references. Id.*, Adm'n. No. 146. NSL chose to ignore the clear mandates of the FCC and even continued calling Ms. Baker after being instructed to stop *on multiple occasions*. *See* Section I. NSL's actions were reckless at best and intentional at worst. Either qualifies as willful.  *Cf. Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (applying a reckless standard for violations of the FCRA).  Moreover, the FCC has held that "'Willful' [in the context of the TCPA] means that the violator knew that he was doing the act in question, in

27

this case, initiating a telephone solicitation. . . . A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance." *In re Dynasty Mortg., LLC*, 22 FCC Rcd 9453, 9470 n. 86, 2007 WL 1427724 (2007).

The Fourth Circuit has admonished, "summary judgment is 'seldom appropriate' on whether a party possessed a particular state of mind." *Dalton v. Capital Assoc'd. Indus., Inc.*, 257 F.3d 409, 418 (4th. Cir. 2001). Willfulness is nearly always a question of fact for the jury. *Cahlin v. Gen'l Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir.1991); *Hammer v. JP's Sw. Foods, L.L.C.*, 739 F. Supp. 2d 1155, 1167 (W.D. Mo. 2010) (collecting cases).

**F.      The TCPA exemption for U.S. government collection calls**.

By Section 301 of the Bipartisan Budget Act of 2015, the TCPA's prohibition against autodialer calls to cell phones was amended to prohibit such a call "unless such call is made solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. §227(b)(1)(A)(iii). NSL has admitted that <u>none</u> of the Four Telephone Calls made to Ms. Baker was made "solely to collect a debt owed to or guaranteed by the United States." <u>Ex. 1, Adm'n. Nos. 36, 72, 111, 145</u>. The reason is that all of loans for which Ms. Baker was listed as a reference were private loans. <u>*Id.*, Adm'n. Nos. 34. 70, 109, 143</u>. As such, this argument appears to be misplaced in a motion for summary judgment on Ms. Baker's individual claims.

This argument would be better made in response to Ms. Baker's pending but not yet fully briefed motion for class certification. NSL appears to acknowledge as much when it asserts "calls on federal loans are subject to unique defenses and Baker cannot pursue claims on those calls for the putative class." Dkt. # 42, at 16. In any event, NSL's attempt falls short of the mark as calls to non-debtor references, even references of borrowers on federal student loans, are not

made "solely to collect a debt" owed to or guaranteed by the United States.

On August 11, 2016, the FCC released its Report and Order designed to implement Section 301 of the Bipartisan Budget Act of 2015. *In the Matter of Rules & Regulations Implementing the Tel. Cons. Prot. Act of 1991*, 31 FCC Rcd. 9074 (2016) ("2016 Order"). In its 2016 Order, the FCC noted, "Because the statutory term 'solely to collect a debt' is ambiguous, the Commission has discretion to reasonably interpret that phrase." *Id. at* ¶ 11. In exercising its discretion, the FCC stated:

> We determine that, because calls made pursuant to the exception must be made "solely to collect a debt," the covered calls may only be made to the debtor or another person or entity legally responsible for paying the debt. <u>Calls are not permitted to other persons listed on the debt paperwork, such as references or witnesses, under our rules</u>. . . . Senators and Members of Congress support our decision to limit covered calls in this way, writing: "The regulations should limit the calls to those made just to the debtors" and "[r]estrict the calls and texts to those made just to debtors—not their family or friends." Another Senator writes separately, urging: "Calls to persons who are not the borrower should be eliminated."

*Id.* at ¶ 21 (emphasis added, footnoted omitted).

Before the 2016 Order became final, Navient Corporation and others filed a Petition for Reconsideration on December 16, 2016. As such, the 2016 Order is not, as of this time, binding on this Court under the Hobbs Act. It is, however, evidence of the FCC's latest position on the issue and persuasive authority. Should this Court accept NSL's invitation to take up the 2015 TCPA amendment at this time, it should adopt the FCC's well reasoned position.

**G.    The FCC's 2016 Broadnet Ruling.**

This argument would also be better made in response to Ms. Baker's pending but not yet fully briefed motion for class certification. Moreover, to fall within the Broadnet Ruling, NSL must prove that it acted <u>as an agent</u> of the federal government in calling the references on student

loans owed to or guaranteed by the United States.  *See  Rules and Regulations Implementing the Tel. Cons.. Prot. Act of 1991, Petitions for Declaratory Ruling by Broadnet Teleservices LLC, et al*., CG Docket No. 02-278, Declaratory Ruling, FCC 16-72, (July 5, 2016) ¶ 16 ("We . . . clarify that the term 'person' in section 227(b)(1) does not include a contractor when acting on behalf of the federal government, <u>as long as the contractor is acting as the government's agent in accord with the federal law of agency</u>.") (emphasis added).

NSL has not offered any legal analysis as to whether it is an agent of the United States or any of its agencies under the federal common law of agency, and it has not attached any contract between itself and the Department of Education which may expressly disavow any agency relationship.  Moreover, it has made no distinction between direct loans to ED, where a contractual relationship may exist with the United States, and FFELP guaranteed loans in which NSL  performs servicing for guaranty agencies or their lenders, and not for the United States ED.

## VI.   CONCLUSION

Defendant's Motion for Summary Judgment or, in the Alternative, Summary Adjudication should be denied.

Date: May 25, 2018                                      Respectfully submitted,

                                                        **DENISE BAKER**
                                                By:    /s/ William L. Downing
                                                        William L. Downing

William L. Downing, VSB 17704            Henry A. Turner (appearing *pro hac vice* )
Attorney for Plaintiff                   Attorney for Plaintiff
CONSUMER LEGAL SOLUTIONS, PC             TURNER LAW OFFICES, LLC
1071 Bay Breeze Drive                    403 W. Ponce de Leon Ave., Suite 207
Suffolk, VA  23435                       Decatur, GA 30030
Tel. 757-942-2554                        Tel.  404-378-6274
Email: wdowninglaw@aol.com               Email: hturner@tloffices.com

30

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of May, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel of record:

Margaret Inomata, VSB No. 84007
VEDDER PRICE, PC
1401 I Street NW, Suite 1100
Washington, DC 20005
Tel. 202-312-3320
Fax 202-312-3322
minomata@vedderprice.com

Lisa M. Simonetti (appearing *pro hac vice*)
VEDDER PRICE (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
Tel. 424-204-7700
Fax 424-204-7702
lsimonetti@vedderprice.com

Christopher Rene Ramos (appearing
*pro hac vice*)
Attorney for Defendant
VEDDER PRICE (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
Tel. 424-204-7700
Fax 424-204-7702
cramos@vedderprice.com

*Counsel for Defendant Navient Solutions, LLC*

/s/ William L. Downing
William L. Downing, VSB No. 17704
CONSUMER LEGAL SOLUTIONS, PC
1071 Bay Breeze Drive
Suffolk, VA  23435
Tel. 757-942-2554
Fax 757-942-2554
Email: wdowninglaw@aol.com.com
*Counsel for the Plaintiff*